60 U.S. 289 (____)
19 How. 289
ARCHIBALD BABCOCK, APPELLANT,
v.
EDWARD WYMAN.
Supreme Court of United States.

*290 The case was argued by Mr. Loring and Mr. Merwin for the appellant, and by Mr. Bartlett for the appellee.
*293 Mr. Justice McLEAN delivered the opinion of the court.
This is an appeal from the decree of the Circuit Court for Massachusetts.
The bill states the following facts: Nehemiah Wyman was seized in fee of about eleven and a half acres of land in Charleston, purchased by him of Tuft's administrator, one acre of which he sold to Foster, who gave a mortgage to secure the payment of the consideration of $600, which sum was not paid when due, and he entered to foreclose. The entire tract on the 1st of December, 1820, had been mortgaged by him to Francis Wyman, his brother, to secure three notes of that date, one for $676, payable in one month; another for $650, payable in six months; the third for $704.39, payable in one year; interest to be paid on each note semi-annually.
Shortly after this, Francis Wyman, by his will, dated 14th June, 1822, devised to defendant, Babcock, all his estate, including said notes and mortgage, in trust for testator's wife and children, and made Babcock his executor. The testator died in August, 1822. On the 1st of December, 1824, Nehemiah paid Babcock, as trustee and executor, the note for $704 and interest; and from time to time paid the interest on the other notes, up to December, 1826.
In 1825 or 1826, Nehemiah became embarrassed, and having entire confidence in his brother-in-law, Babcock, he, by deed, 26th April, 1826, mortgaged the eleven acres of land as security of a note to Babcock of that date, for $1,200, payable in one year, with interest. At this time, little, if anything, was due to Babcock, but it was understood, between them, that Babcock would become security for him, or advance money to him, the mortgage to stand as a security. Before the 20th of November, 1828, Babcock did become bound for and advanced *294 to him upwards of $400. In addition to this, there was due to Babcock as executor, for rent, $136.71. On a settlement, Nehemiah executed to Babcock three notes, one dated 7th November, 1828, for $486.79, of which $400.08 were due Babcock individually, and $86.71 to the heirs of Nehemiah Wyman, sen.; another note for $8.10, and third for $50, due to the heirs of the same, were given.
Nehemiah being thus indebted to Babcock, as trustee and executor, and not being able to pay the interest, Babcock and William Wyman, brother of Nehemiah, urged him to make a clear deed in fee for the land aforesaid, to Babcock, that he might manage and improve the same, and apply the rents and profits to pay interest on the encumbrances, and to the gradual liquidation of the principal. And finding that this conveyance to Babcock was made a condition of further advances, he eventually conveyed the estate to Babcock, it being expressly agreed by Babcock, that, notwithstanding the form of the conveyance, it should stand as security only for the sums due to him.
That on the 20th of November, 1828, a memorandum was made out of the sums thus due, and handed to Nehemiah, as evidence of the amount for which the land was held.
At the time this deed was executed, no one of the notes held by Babcock was surrendered, nor the mortgage to Francis Wyman, deceased. All the evidences of indebtedness remained in the hands of Babcock, Nehemiah holding only the memorandum of the sums. The total amount of the notes in said memorandum, with interest to the 20th November, 1828, amounted to the sum of $2,033.87.
Upon receiving the above deed, Babcock took possession under it, not only of the eleven acres, but of the adjoining acre. Babcock, it is alleged, received annually, from sales of clay, grass, and ledge stone, from the land, more than enough to pay interest and taxes. Nehemiah having removed to the West, regardless of his trust, Babcock sold the land at private sale, without notice to the said Nehemiah, and in fraud of his rights, for eight thousand dollars.
In the sale, Babcock represented himself to be the sole owner of the premises. On the 4th of February, 1853, Nehemiah conveyed his right to redeem to Edward Wyman, the complainant, &c. Within two years, Babcock has promised William Wyman, acting for his brother, that he would come to an account with Nehemiah for the price of the land, and pay him the proceeds of the sales, deducting the debts aforesaid, if he would take his notes on time; and would refer the question of amount of rents and profits to the arbitrament of neighbors. *295 Babcock has frequently, recently, admitted that it was originally intended that said deed should stand as security for the amount set forth in the memorandum; and that he always intended to do right in the matter, but that he had been advised by counsel, that the agreement, not being in writing, could not be enforced, and this was the reason he refused to perform it.
The bill prays for an account, and the defendant in his answer admits the conveyance stated in the bill, and that the land was subject to the mortgages. He avers the consideration named in the deed was the amount then due defendant in his own right, and as executor and trustee; and the further sum of $8.10, due the defendant, and $50 due as agent. He admits no additional consideration was paid; but he states the land was not worth more than $1,900; that he consented to receive the deed in payment of the sums due him personally, and upon an agreement that if he should be able to obtain therefrom, in addition, enough to pay the sums due to him as executor and trustee, he would pay these sums, and upon no other trust or confidence whatever.
That, upon the delivery of the deed, he cancelled the notes of Nehemiah held in his own right, and either surrendered them to him or destroyed them. That he did not cancel the notes held by him as executor or trustee, because he was not satisfied that he should receive enough from the land to pay the same; and in order to prevent the presumption that he had so agreed absolutely, he made a minute thereon to the effect that he did not guaranty the payment thereof, it being the understanding between him and Nehemiah, that Nehemiah should be personally liable therefor.
That he made no other agreement, and he denies that it was understood or agreed, that the land was conveyed to him on the trust set forth in the bill; but insists that the conveyance was absolute, in payment of the sums due him, and liabilities incurred; and the only understanding was, that if the defendant should realize therefrom more than enough to pay his own claims, he would pay the debts due him as executor and trustee.
Defendant took possession of the land, and for eight years occupied it, Nehemiah never claiming any interest in it. He denies the allegations of the bill, as to the trust; sets up the defence, that the agreement, not being in writing, cannot be enforced. He denies that he proposed a compromise, if his notes would be taken on time, as alleged, and he pleads the statute of twenty years limitation, &c., and avers the profits of the land did not exceed the taxes, &c.
Three points may be considered as embracing the merits of this case:
*296 1. Was the deed executed by Nehemiah Wyman to Babcock, for the eleven and one-half acres of ground, given in trust?
2. Can this trust be established by parol evidence?
3. Does the statute of limitation or lapse of time affect the complainant's rights?
No one can read the history of this case, as stated in the bill, without being impressed with the confidential relations of the parties. The grantor and the grantee were brothers-in-law, and the advisers bore the same relation to the grantee. It was a family concern, designed, as it would seem from the bill, to aid an embarrassed member of it, without a probability of loss by the other members.
The bill charges, when the deed in question was executed, the sums which it was intended to secure were stated, and handed to Nehemiah. This is not denied in the answer, and William Wyman, the brother, being present, swears, as a witness, to the sums so stated, amounting in the whole to the sum of $2,033.87, the consideration named in the deed. This list was in the handwriting of the son of Babcock, and the paper was delivered to Nehemiah in the presence of the witness. The deed was drawn by the witness, and he knows that the sums named included all the debts which Nehemiah owed to Babcock individually, or as trustee. The witness remembers Babcock said, after the statement was made, add sixty-two cents for recording the deed, which made the sum inserted as the consideration in the deed. Nehemiah hesitated to sign the deed, when Babcock said, he can have the land again, at any time he shall pay the debts secured by it.
The answer avers, when the deed was executed, the defendant gave up the notes of Nehemiah held in his own right, and either surrendered them to him or destroyed them. But it is proved by the same witness that he did neither. These notes were given to the witness without explaining to whom they belonged. Witness supposed they belonged to the estate of Nehemiah Wyman, sen.
The witness says, the property, at the time it was sold, was worth thirteen or fourteen thousand dollars, and that it was sold greatly below its value.
The bill charges, that the defendant promised William Wyman, acting for his brother, that he would come to an account with Nehemiah for the price of the land, and pay him the proceeds of sales. This is denied in the answer. William Wyman swears, that on the 8th of November, 1851, he showed to Babcock the memorandum of the sums named, to secure the payment of which the deed was executed. He was much embarrassed, and admitted the handwriting was his son's, then *297 deceased. He then expressed a willingness to settle it up, and asked the witness, how shall this be done? Witness replied, that he should first charge Nehemiah with all his notes and interest, and then credit him with the proceeds of the land, and what he received from the land, with interest, and be allowed a fair compensation for his trouble. He then said, I can't tell how much I have received from the land, but we will leave it to two good men; and that he would give his note for what should be due.
A short time after this, Babcock told witness that he had consulted counsel, who advised him to pay the amount due the estate of Nehemiah, sen., and no more; and this he offered to do, if the witness would execute a bond of indemnity against any farther claim. He said that he had been advised, as the deed was absolute on its face, and no writing showed that the land was conveyed in security of a debt, the obligation could not be enforced.
The witness signified to Babcock, some time before the sale of the land, that he would redeem it for his brother.
Nehemiah Wyman, having transferred all his interest to the complainant, was examined as a witness, who stated, at the time he executed the deed to Babcock, he owed him, as an individual, as executor and agent, the sum of $2,033.87, which included sixty-two cents for recording the deed; and that sum was stated as the consideration in the deed. Of this sum, only $408.18, and interest, were due to Babcock in his individual capacity.
In his answer, the defendant states that the conveyance was made in payment of the sums due him personally; that he did not cancel the notes held by him as executor or trustee, because he was not satisfied that he should receive enough from the land to pay those debts. But the proof shows, that the debt due him as executor and agent, and also his individual debt, were all included in the consideration named in the deed.
The defendant made no advance to the witness, on the note and mortgage for twelve hundred dollars; but, at the date of the subsequent conveyance, the defendant had advanced to him $400.08, and $8.10, which, as above stated, constituted the debt due to the defendant on his personal account.
The conveyance was made to the defendant, the witness swears, with the express understanding, that Babcock was to have the entire management of the land, so as to apply the proceeds in payment of the interest, and witness was to have the land again on paying the sums specified. He was induced to make the conveyance by the urgent request of his brother William, and Babcock; his brother told him, if he did not *298 make it, he would not assist him in his pecuniary matters. On the execution of the deed, none of the notes held by Babcock were cancelled, or surrendered to the witness; but they are still held against him.
The witness says that Babcock promised to keep an account of the receipts of the land conveyed to him; but in his answer he says he kept no account, "because the land and rents and profits were his own, without any liability to account to any one."
Such a transaction as set out in the bill, between brothers-in-law, in the nature of things might be supposed to have taken place in the mutual confidence of the parties; and in the final adjustment there should be no evasions or subterfuges to gain an advantage. So far as regards the deed under consideration, all the material allegations of the bill are proved, and all the material averments of the answer seem to be unfounded. In coming to this conclusion, we do not rest alone on the witnesses, Nehemiah and William Wyman. There are strong circumstances which corroborate the witnesses, and satisfy the mind beyond a reasonable doubt.
In his answer, the defendant avers that the land was conveyed to him in payment of the sums due him personally. It appears from the oaths of both the Wymans that this is not correct; and, in addition, it is shown by the memorandum made out at the time, stating the sums for which the land was conveyed, in the handwriting of the son of the defendant.
Taking the statement of the defendant as true, that he did not intend to make himself responsible for the debt due to him as executor and agent at the time the deed was executed, presents him in an unfavorable light. The land for which he received a deed from Nehemiah Wyman, he was aware, had been previously mortgaged to secure the debt in his hands as executor of Francis Wyman. Could he have carried out this declared intention, he would have been unfaithful to the trust committed to him.
William Wyman seems to be a man of business. He drew the conveyance from his brother Nehemiah to his brother-in-law Babcock, and he took, in other-respects, an active agency in the transaction; and he states the facts as alleged in the bill, and his statement is in every respect corroborated by his brother Nehemiah; and although the trust is denied in the answer, there are circumstances in the case which go strongly to establish it.
The defendant admitted all the facts to William Wyman, and promised to settle the account, and spoke of the principles on which it should be adjusted, but eventually he took refuge *299 under the statutes of frauds, of limitations, and the lapse of time. We think there can be no reasonable doubt that the deed in controversy was intended to be a mortgage. And this brings us to the second point of inquiry:
Can the trust be established by parol testimony?
If the doctrine of this court is to be adhered to, as laid down in the case of Russell v. Southard, (12 How., 154,) this is not an open question. In that case the court say: "To insist on what was really a mortgage, as a sale, is in equity a fraud." And in Conway v. Alexander, (7 Cranch, 238,) Chief Justice Marshall says: "Having made these observations on the deed itself, the court will proceed to examine those extrinsic circumstances which are to determine whether it was a sale or a mortgage." In Morris v. Nixon, (1 How., 126,) the court say: "The charge against Nixon is substantially a fraudulent attempt to convert that into an absolute sale, which was originally meant to be a security for a loan. It is in this view of the case that the evidence is admitted to ascertain the truth of the transaction, though the deed be absolute on its face."
In Edrington v. Harper, (3 J.J. Marshall, 355,) the court say: "The fact that the real transaction between the parties was a borrowing and lending, will, whenever or however it may appear, show that a deed absolute on its face was intended as a security for money; and whenever it can be ascertained to be a security for money, it is only a mortgage however artfully it may be disguised."
In Jenkins v. Eldredge, (3 Story's Rep., 293,) Mr. Justice Story said: In 4 Kent, 143, (5th edit.,) it is declared, "a deed absolute upon the face of it, and though registered as a deed, will be valid and effectual as a mortgage between the parties, if it was intended by them to be merely a security for a debt. And this would be the case, though the defeasance was by an agreement resting in parol; for parol evidence is admissible to show that an absolute deed was intended as a mortgage, and that the defeasance had been omitted by fraud or mistake." In 2 Sumner's Rep., 228, 232-'3, Judge Story said: "It is the same, if it be omitted by design upon mutual confidence between the parties; for the violation of such an agreement would be a fraud of the most flagrant kind, originating in an open breach of trust against conscience and justice."
In Foy v. Foy, (2 Hayward, 141:) "In North Carolina, it is said the law on this subject is the same as the English law was before the statute of frauds, and parol declarations of trust are valid." "Where a testator gave by will all his estate to his wife, having confidence that she would dispose of it according to his views communicated to her, and it being alleged *300 that the testator, at the time of making the will, desired his wife to give the whole of the property to B, and that she promised to do it, it was held, that the allegation being proved, a trust would be created as to the whole of the property in favor of B." (Podmore v. Gunning, 7 Simons, 644.)
Parol proof is admissible to show fraud, and consequently a resulting trust, in a deed absolute on its face, notwithstanding any denial by the answer. (Lloyd v. Spillote, 2 Atk. Rep., 150; Ross v. Newall, 1 Wash. Rep., 14; Watkins v. Stockett, 6 Har. and Johnson, 435; Strong v. Stewart, 4 John. Ch. Rep., 167; English v. Lane, 1 Porter's Ala. Rep., 318.)
In Boyd v. McLean, (1 John. Ch. Rep., 582,) it was held, after an examination of the cases, "that a resulting trust might be established by parol proof, not only against the face of the deed itself, but in opposition to the answer of the nominal purchasers denying the trust, and even after the death of such purchaser." The statute of frauds in Rhode Island contains no exception in favor of resulting trusts, but Mr. Justice Story considered the exception immaterial, for it has been deemed merely affirmative of the general law. (1 Sumner, 187.)
Where a trustee misapplies the fund, it may be followed, however it may have been invested, by parol, as between the parties, or a purchaser with notice. So, where an estate was purchased in the name of one person, and the consideration came from another, a resulting trust may be established by parol  and in all cases where there is a resulting trust.
In Hayworth v. Worthington, (5 Black., 361,) it was held that parol evidence is admissible to prove that a bill of sale of goods, absolute on its face, was intended by the parties to be only a mortgage. The court say these decisions are founded upon the assumption that the admission of such evidence is necessary for the prevention of fraud. (Cas. Temp. Talbot, 62; King v. Newman, 2 Munf., 40; Strong v. Stewart, 4 John. Ch. Rep., 167; Dunham v. Dey, 15 John. R., 555; Walton v. Cronly's Adm'r, 14 Wend., 63; Van Buren v. Olmstead, 5 Paige, 9.)
In the case of Overton v. Bigelow, (3 Yerger, 513,) it was held, "that an absolute bill of sale of negroes may be converted into a mortgage by a parol agreement to allow the conveyor to redeem; and this agreement may be inferred from the price given, and the mode of dealing between the parties."
The case of Walker v. Locke et al. (5 Cushing, 90) is considered as having no application to the case before us. It is well known that until within a few years the courts of Massachusetts had no chancery jurisdiction. The jurisdiction, when first conferred by statute, was limited to cases of specific execution *301 of contracts and trusts, not including fraud as a ground of relief. Within some one or two years past, the jurisdiction has been extended to frauds, but this has been done since the decision in the case above cited.
If the decision had been made since the extension of the jurisdiction beyond the construction of the local statutes, we should consider it only as the decision of a highly respectable and learned court, and not as a rule of decision for this court.
It is admitted that the authorities on the question before us are conflicting in this country and in England; but as this court in several cases have decided the point, and it is now and has been for several years past a rule of decision, we are not prepared to balance the State authorities, with the view of ascertaining on which side the scale preponderates.
The third point regards the lapse of time and the statute of limitations.
In his answer, the defendant avers that the pleadings show a possession by him of more than twenty years before the institution of this suit, and that that possession has never been disturbed; and also that the proceeds of sale were received more than six years before the bill was filed, and these facts are relied on to bar the right of the complainant.
It is clear that the statute cannot constitute a bar in the present case. Courts of equity apply the statute by analogy to cases at law; but in this case, the trust being established, there was no adverse possession in favor of which the statute could run. The possession was consistent with the intentions of the parties, until the fraud was discovered, in 1851. Nor can the statute bar the right of the complainant to the proceeds of the land, as Babcock was bound to apply these to the payment of interest on the debt, and in discharge of the principal.
The decree of the Circuit Court is affirmed with costs.
Mr. Justice CATRON and Mr. Justice CAMPBELL dissented.
Mr. Justice CATRON dissenting.
The opinion just pronounced maintains that a deed in fee, without conditions, and made in that form, according to an agreement of the parties at the time, may be proved to have been a mortgage by parol evidence, establishing that a defeasance was part of the agreement when the absolute deed was executed; but that it was left out by design. And that this parol proof may be made, after the lapse of more than twenty years from the date of the deed before the grantee was sued; *302 he having been in possession of the land conveyed, holding it under the deed from its date up to the time when the suit was brought.
The defendant (among other things) relied on the statute of frauds as a defence to the suit. Lord Hardwicke lays down the rule (in Montacute v. Maxwell, 1 P. Williams, 618) to be, that where there was no fraud or mistake in the original transaction, and the word or promise of the defendant was relied on, the statute of frauds declares such promise void, and equity will not interfere. And in this doctrine I understand the Supreme Judicial Court of Massachusetts to concur. (Walker v. Locke, 5 Cush., 90.)
The effect of the defeasance here set up, by parol evidence, is, that it defeats the absolute deed, and makes it void on payment of a sum of money. On general principles the rule is, that where there is a written contract, all antecedent propositions, negotiations, and parol interlocutions, on the same subject, are deemed to be merged in such contract. (1 Story Com., p. 173, sec. 160; 2 Story, p. 286, sec. 1,018.)
There must be, fraud or mistake in making the agreement, if it can be reformed. (Id., sec. 157, p. 169.)
I think the parol proof was inadmissible both by the statute of frauds of Massachusetts, and according to the general rule referred to; and that the decree should be reversed, and the bill dismissed.
Mr. Justice CAMPBELL dissenting.
The defendant, in the year 1828, entered upon the land conveyed to him by Nehemiah Wyman, and retained it until 1844. He then sold it as his own property, and appropriated the price to his own use. During this whole period, there was no act on the part of Wyman from which the relation of a mortgagor or debtor can be inferred, and no account was rendered by the defendant, nor was any act performed by him inconsistent with his deed.
The evidence relied on to engraft a trust on this deed consists of conversations reported by Nehemiah Wyman, the debtor, and his brother William, as contemporaneous with the deed, and other conversations reported by William Wyman as occurring in 1844 and 1851; and also the statements of the answer.
No intercourse between Nehemiah Wyman and the defendant took place between 1828 and 1851, directly or mediately, relative to this subject.
The witness, Nehemiah. Wyman, is not, in my opinion, a competent witness. This suit is brought by his son upon an *303 assignment made after the controversy had commenced, and with the acknowledged purpose of using his father as a witness.
It was found that sufficient evidence did not exist to support the claim, and machinery was resorted to, calculated to introduce the evils of champerty and maintenance.
The witness sold his claim, with a concession to the assignee to employ him as a witness to establish it.
Such a practice holds out to parties a strong temptation to commit perjury. (Bell v. Smith, 5 B. and C., 188, J. Bayley's Opinion; Maury v. Mason, 8 Part., 212; Clifton v. Sharpe, 15 Ala. R., 618; 1 Penn. R., 214; 12 Pet., 140.)
The testimony of Edward Wyman is open to much observation; and I feel entirely indisposed to rest a decree upon his evidence. Nor do I see intrinsic difficulties in the inconsistencies of the answer. I cannot shut my eyes to the fact that nothing has been done between these parties for above twenty-three years inconsistent with the relations of vendor and vendee, or consistent with the relations of a creditor and debtor, except the detention of the evidence of the original debt by the defendant, and the most important part of that evidence was cancelled in 1830 by him.
I dissent from the opinion of the court in reference to the jurisdiction of the Circuit Court of the United States in Massachusetts. It is admitted that, in the courts of Massachusetts, this trust could not be incorporated into the deed. The statute of frauds prevents it. (Walker v. Locke, 5 Cush., 90.)
This statute constitutes a rule of property for the State. In the present case, the subject of the suit is a contract made in Massachusetts, by citizens of that State, and affecting the title to real property there. In my opinion, the statute law of Massachusetts furnishes a rule of decision to the courts of the United States.